In the
United States Court of Appeals
for the Fifth Circuit

No. 25-30380

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

TALANZO DEBROW,

*Defendant - Appellant*

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 5:24-CR-238-1

## ORIGINAL BRIEF FOR THE APPELLANT
## TALANZO DEBROW

**REBECCA L. HUDSMITH**
Federal Public Defender

**DUSTIN C. TALBOT**
Appellate Chief
Federal Public Defender's Office
Middle and Western Districts of
Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

*Attorney for the Appellant*

In the
United States Court of Appeals
for the Fifth Circuit

No.  25-30380

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

TALANZO DEBROW,

*Defendant - Appellant*

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 5:24-CR-238-1

## ORIGINAL BRIEF FOR THE APPELLANT
## TALANZO DEBROW

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

i

**Judges Below:**

The Honorable S. Maurice Hicks, Jr., United States District Judge
The Honorable Mark L. Hornsby, United States Magistrate Judge

**Defendant - Appellant:**

Talanzo Debrow
B.O.P. Reg. No. 46768-511

**Attorneys for the Defendant - Appellant:**

Dustin C. Talbot (on appeal)
 Appellate Chief
Caroline (Tory) Green (in the district court)
 Assistant Federal Public Defender
 Federal Public Defender's Office
 Middle and Western Districts of Louisiana

**Attorneys for the Government - Appellee**

Camille Ann Domingue (on appeal)
Cheyenne Yvette Wilson (in the district court)
Michael T. Shannon (in the district court)
 Assistant United States Attorneys

Lafayette, Louisiana, October 23, 2025.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT

ii

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Talanzo Debrow respectfully requests oral argument on an issue of first impression in this Circuit: whether 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to an individual whose sole disqualifying conviction is for aggravated criminal damage to property under Louisiana law—a non-violent property offense that requires neither actual violence, use of a weapon, nor intent to harm any person.

The constitutional analysis requires careful consideration of the Supreme Court's evolving Second Amendment jurisprudence following *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), particularly the proper application of historical analogues to property offenses that create foreseeable danger without involving actual violence or weapons. This case presents the precise type of as-applied challenge that this Court in *United States v. Diaz*, 116 F.4th 458, 470 n.4 (5th Cir. 2024), explicitly left open, and oral argument would significantly aid the decisional process in determining whether founding-era Americans would have permanently disarmed individuals convicted of property damage offenses.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................iii

TABLE OF CONTENTS ...................................................................iv

TABLE OF AUTHORITIES ..............................................................vi

STATEMENT OF JURISDICTION......................................................1

STATEMENT OF THE ISSUE............................................................2

> Whether 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to an individual whose sole disqualifying conviction is for aggravated criminal damage to property under Louisiana law, an offense that does not require actual violence, use of a weapon, or intent to harm any person?

STATEMENT OF THE CASE ..............................................................2

   I.   Debrow's sole disqualifying conviction stems from a property damage incident when he was operating a stolen vehicle..........2

   II.   The instant federal charges and Debrow's constitutional challenge ...............................................................................3

   III.   The district court's ruling and Mr. Debrow's conditional plea...4

SUMMARY OF THE ARGUMENT .......................................................5

ARGUMENT ...................................................................................7

   I.   18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to Mr. Debrow because the government cannot show

a historical tradition of permanently disarming individuals convicted of property damage offenses ........................................ 7

A.    Standard of review: *de novo* ................................................ 7

B.    The *Bruen/Diaz* test ........................................................ 7

C.    Mr. Debrow's conviction for aggravated criminal damage to property has no historical analogue that would justify permanent disarmament ............................ 12

    1.    The Second Amendment's plain text covers Mr. Debrow's conduct ........................................................ 12

    2.    The government cannot meet its burden through founding-era property crime analogues ........................ 13

    3.    Going-armed laws provide no relevant analogue for property damage convictions ........................................ 15

    4.    This Court's precedents in *Reyes, Betancourt,* and *Simpson* are distinguishable ........................................ 17

    5.    Preservation of the constitutional claim for further review .................................................................... 21

CONCLUSION ...................................................................... 22

CERTIFICATE OF SERVICE ................................................ 23

CERTIFICATE OF COMPLIANCE ....................................... 23

# TABLE OF AUTHORITIES

CASES                                                                                            PAGE

*Class v. United States*, 583 U.S. 174 (2018) ............................................... 7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............. 7-8, 12, 14-15

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .................................................................... *passim*

*United States v. Betancourt*, 139 F.4th 480 (5th Cir. 2025) ......... 6, 17-21

*United States v. Clark*, 582 F.3d 607 (5th Cir. 2009) .............................. 7

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003) .................... 10

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) .................... *passim*

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *rev'd*, 602 U.S. 680 (2024) ................................................................. 9

*United States v. Rahimi*, 602 U.S. 680 (2024) ................................... 9, 22

*United States v. Reyes*, 141 F.4th 682 (5th Cir. 2025) ................. 6, 17-21

*United States v. Simpson*, 152 F.4th 611 (5th Cir. 2025) ............. 6, 17-21

STATUTES

U.S. Const. amend. II ................................................................. *passim*

18 U.S.C. § 922(g)(1) ................................................................ *passim*

18 U.S.C. § 922(g)(8) ......................................................................... 9

18 U.S.C. § 3231 ............................................................................... 1

18 U.S.C. § 3742 ............................................................................... 2

vi

28 U.S.C. § 1291 ...................................................................................2

La. R.S. § 14:55............................................................ *passim*

𝕴𝕟 𝕥𝕙𝕖
𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
𝖋𝖔𝖗 𝖙𝖍𝖊 𝕱𝖎𝖋𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

---

No.  25-30380

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

TALANZO DEBROW,

*Defendant - Appellant*

---

Appeal from the United States District Court
For the Western District of Louisiana
USDC No. 5:24-CR-238-1

---

## ORIGINAL BRIEF FOR THE APPELLANT TALANZO DEBROW

---

## STATEMENT OF JURISDICTION

This matter originated in the United States District Court for the Western District of Louisiana. The district court's jurisdiction arose under 18 U.S.C. § 3231 inasmuch as the action involved an allegation of an offense against the United States. This is an appeal of a final judgment entered by the district court on July 2, 2025. ROA.87.

1

Appellant filed a timely notice of appeal on July 3, 2025. ROA.93. As such, this Court's jurisdiction to review the matter is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

STATEMENT OF THE ISSUE

Whether 18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to an individual whose sole disqualifying conviction is for aggravated criminal damage to property under Louisiana law, an offense that does not require actual violence, use of a weapon, or intent to harm any person?

STATEMENT OF THE CASE

I.    **Debrow's sole disqualifying conviction stems from a property damage incident when he was operating a stolen vehicle**

On May 5, 2019, Louisiana State Police troopers in Shreveport conducted a traffic stop on a stolen vehicle driven by Debrow. ROA.64. During the stop, Debrow reversed the vehicle and struck one trooper's vehicle and then drove forward and struck a second trooper's vehicle before surrendering. ROA.64, 236.

On May 8, 2020, Debrow pleaded guilty to aggravated criminal damage to property in Louisiana state court for damaging the trooper's vehicles. ROA.256. Louisiana defines aggravated criminal damage to

2

property as the "intentional damaging of any structure, watercraft, or movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion." La. R.S. § 14:55(A). The state court sentenced Mr. Debrow to three years at hard labor. ROA.256.

## II.    The instant federal charges and Debrow's constitutional challenge

On November 26, 2024, a federal grand jury returned a one-count indictment charging Mr. Debrow with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). ROA.9. The indictment alleged that on or about January 9, 2023, Mr. Debrow knowingly possessed a Pioneer Arms pistol and ammunition after having been previously convicted of a crime punishable by imprisonment for a term exceeding one year. ROA.9. Specifically, Mr. Debrow was as backseat passenger in a stolen vehicle on that date and he fled on foot after the vehicle was stopped by police. ROA.187. Officers located a handgun in the vehicle where Mr. Debrow was seated. ROA.187.

Mr. Debrow moved to dismiss the indictment, arguing that § 922(g)(1) violates the Second Amendment as applied to him. ROA.18. Mr. Debrow argued that under the Supreme Court's decision in *Bruen* and this Court's decision in *Diaz*, the government must demonstrate that the

Nation has a longstanding tradition of disarming someone with a criminal history analogous to his single conviction for aggravated criminal damage to property. ROA.18-22, 52-58. He further argued that the government failed to make the threshold showing that aggravated criminal damage to property was severely punished at the founding or that any historical analogues exist for permanently disarming someone based on such a conviction. ROA.53-57.

The government opposed the motion, arguing that Mr. Debrow's prior felony conviction fits neatly within the Nation's historical tradition of firearm disarmament because he committed a "violent act in public" by deliberately ramming the vehicles. ROA.32-46.

## III.   The district court's ruling and Mr. Debrow's conditional plea

On February 10, 2025, the district court denied Mr. Debrow's motion to dismiss. ROA.64-70. The court acknowledged that under *Diaz*, the plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1), thus satisfying step one of the *Bruen* analysis. ROA.67.

Moving to step two, the court found that going-armed laws provided sufficient historical analogues to justify Mr. Debrow's disarmament. ROA.68. The court reasoned that both going-armed laws and § 922(g)(1)

4

"seek to punish those that have used their guns in a way likely to lead to violence or to upset the public order" and can result in permanent disarmament. ROA.69. The court concluded that Mr. Debrow "intentionally committed a violent act in public which endangered the lives of others," and therefore his conviction was consistent with the Nation's historical tradition. ROA.69.

Following the district court's ruling, Mr. Debrow entered a conditional guilty plea, expressly preserving his right to appeal the denial of his motion to dismiss. ROA.179. The district court sentenced Mr. Debrow to 56 months. ROA.88. This timely appeal followed.

## SUMMARY OF THE ARGUMENT

The district court erred in denying Mr. Debrow's motion to dismiss the indictment. Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), the government bears the burden of demonstrating that disarming Mr. Debrow is consistent with the Nation's historical tradition of firearm regulation. The government cannot meet this burden.

Mr. Debrow's sole disqualifying conviction is for aggravated criminal damage to property—a non-violent property offense that

requires neither the use of a weapon nor intent to harm any person. The government has failed to identify any founding-era tradition of permanently disarming individuals convicted of property damage. Historical property crime analogues do not support permanent disarmament, as property offenses at the founding were typically punished through restitution or temporary measures, not the permanent loss of fundamental rights. Going-armed laws, which targeted individuals who actively terrorized others with weapons, share neither the purpose nor the burden of disarming someone for damaging property without using or possessing a firearm. While this Court's precedents in *Reyes*, *Betancourt*, and *Simpson* involved violent conduct during high-speed chases that endangered public safety, Mr. Debrow's discrete property damage incident lacks the ongoing violent character that justified disarmament in those cases. The district court's judgment should be reversed.

<u>ARGUMENT</u>

I.   **18 U.S.C. § 922(g)(1) violates the Second Amendment as applied to Mr. Debrow because the government cannot show a historical tradition of permanently disarming individuals convicted of property damage offenses**

A.   **Standard of review: *de novo***

Debrow preserved his as-applied constitutional challenge to 18 U.S.C. § 922(g)(1) via conditional plea agreement, expressly reserving "his right to appeal the Court's adverse ruling as to his Motion to Dismiss" pursuant to Federal Rule of Criminal Procedure 11(a)(2). ROA.179. Nevertheless, a guilty plea does not bar a criminal defendant from later appealing his conviction on the ground that the statute of conviction violates the Constitution. *Class v. United States*, 583 U.S. 174 (2018). The Court reviews constitutional challenges to a statute *de novo*. *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009).

B.   **The *Bruen/Diaz* Test**

The Second Amendment mandates that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that a Washington D.C. law that prohibited possession of

handguns in the home was unconstitutional. The Court interpreted the language of the Second Amendment and determined that its drafters intended for it to protect "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Thus, D.C.'s categorical prohibition did not pass constitutional muster. *Id.* at 628-29.

In 2022, the Supreme Court revisited and refined *Heller* in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). There, the Court extended *Heller*'s protection for carrying handguns in the home to carrying them publicly. *Id. at* 8-9. In so doing, the Court also clarified the correct two part test for assessing whether a gun regulation violates the Second Amendment. In the first step, the Court considers whether the challenged law impinges upon a right protected by the Second Amendment. *Id.* at 19. When step one's requirements are met, the Constitution presumptively protects that conduct. The burden then shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. This involves addressing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The *Bruen* Court held that the plain text of the Second Amendment protects the right to bear arms

in public for self-defense, and that the government had failed to "identify an American tradition" justifying the regulation of such behavior. *Id.* at 38-39. The challenged New York law thus violated the Second Amendment.

This Court applied *Bruen* to find § 922(g)(8) unconstitutional in *United States v. Rahimi*, 61 F.4th 443, 450-51 (5th Cir. 2023), *rev'd*, 602 U.S. 680 (2024) (hereinafter "*Rahimi I*"). The *Rahimi I* panel considered various "historical analogues" and found that they were not "relevantly similar" precursors to § 922(g)(8). *Id.* at 456. The Supreme Court reversed. 602 U.S. at 701-02. An eight-Justice majority held that § 922(g)(8) "fits comfortably" in this Nation's tradition of "preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 690. The Court first cited surety laws as a historical analogue. Those laws required individuals to post bonds whenever there was a "probable ground to suspect of future misbehaviour." *Id.* at 695 (quoting 4 Blackstone 251). Surety laws were used to "prevent all forms of violence, including spousal abuse" and the misuse of firearms. *Id.* at 695. The Court also relied on "going armed" laws, which prohibited "riding or going armed, with dangerous or unusual weapons, to terrify

the good people of the land." *Id.* at 697 (brackets omitted) (quoting 4 Blackstone 149). Because such conduct "disrupted the public order and led almost necessarily to actual violence .... the law punished these acts with forfeiture of the arms and imprisonment." *Id.* (cleaned up).

In *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), this Court issued its first decision analyzing a post-*Bruen* facial and as-applied constitutional challenge to § 922(g)(1). The *Diaz* Court first rejected the three main arguments advanced by the government. First, *Diaz* held that *Bruen* established a "new historical paradigm for analyzing Second Amendment claims" which rendered prior Circuit precedent (like *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003)) obsolete. *Id.* at 465. Second, *Diaz* held that felons are among "the people" protected by the Second Amendment. *Id.* at 466. Third, *Diaz* held that the "plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Id.* at 467.

Thus, according to *Diaz*, the burden shifted to the government to demonstrate that regulating Diaz's possession of a firearm is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 467 (quoting *Bruen*, 597 U.S. at 24).

10

> To satisfy this burden, the government must "identify a well-established and representative historical analogue, not a historical twin." Evidence must be "relevantly similar" to the challenged law. In assessing similarity, we consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."

*Id.* at 467 (citations omitted).

> To survive Diaz's as-applied challenge, the government must demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history analogous to this.

*Id.* at 467. The Court explained that when assessing the government's proffered historical analogues, the Court can *only* consider the defendant's predicate offenses under § 922(g)(1) that are "punishable by imprisonment for a term exceeding one year." Other prior convictions, arrests, or other conduct are "not relevant for our purposes." *Id.* at 467.

The Court then held that whether § 922(g)(1) is constitutional as applied to a particular defendant depends on whether the underlying felony conviction would have been punished by death or estate forfeiture at the Founding. *Id.* at 467-70. Because capital punishment and estate forfeiture "permanently punish[ed] offenders" convicted of certain crimes, the Court reasoned, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Id.* at 469. The

Court looked at Diaz's prior conviction for felony vehicle theft and noted that those convicted of horse theft historically (an analogue to vehicle theft) were often subject to the death penalty which established that our country has a historical tradition of severely punishing people like Diaz who have been convicted of vehicle theft. *Id.* at 168-69. The Court left the door open, however, to "as-applied challenges by defendants with different predicate convictions" that were not severely punished at the Founding. *Id.* at 470 n.4.

C.  **Mr. Debrow's conviction for aggravated criminal damage to property has no historical analogue that would justify permanent disarmament**

1.  **The Second Amendment's plain text covers Mr. Debrow's conduct**

The first step of the *Bruen* analysis is satisfied here. This Court has already held that "the plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Diaz*, 116 F.4th at 467. The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. Mr. Debrow, as one of "the people," sought to possess a firearm—conduct squarely within the Amendment's text. *See Heller*, 554 U.S. at 580 (the term "the people" "unambiguously refers to all members of the political community").

12

The district court correctly recognized this point, acknowledging that Mr. Debrow's "conduct prohibited by § 922(g)(1) is covered by the Second Amendment." ROA.67. Since the first step is satisfied, the burden shifts to the government to demonstrate that regulating Mr. Debrow's possession of a firearm is consistent with the Nation's historical tradition of firearm regulation.

### 2. The government cannot meet its burden through founding-era property crime analogues

The government bears the burden of identifying historical laws that permanently disarmed individuals for property offenses comparable to aggravated criminal damage to property. This burden cannot be met because no such tradition exists in American history.

Louisiana's aggravated criminal damage to property statute criminalizes "the intentional damaging of any structure, watercraft, or movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion." La. R.S. § 14:55(A). At its core, this remains a property offense—it requires neither actual violence, actual danger to human life, nor the use of a weapon. The statute's enhanced penalty stems from the potential for risk, not from any actual harm to persons.

In its lengthy briefing below, the government failed to point to a single colonial statute or regulation from the Founding-era that punished a crime of mere property damage with death or permanent estate forfeiture. *See* ROA.28-47. The only historical law cited by the government was a single *English* law from the mid-18th century that made it a capital offense to break into a structure with the intent to cut or destroy property therein. ROA.42 (citing to 1 Leon Radzinowicz, *A History of English Criminal Law and its Administration from 1750, The Movement for Reform* 655-56 (London: Stevens & Sons, 1948) (available at:https://archive.org/details/in.ernet.dli.2015.238530/page/n673/mode/2 up)). This English crime simply a version of burglary. It is clearly not analogous to Louisiana aggravated criminal damage to property because the Louisiana crime has nothing to do with entering a structure or dwelling to destroy property. Nor do the actual facts of Mr. Debrow's property damage crime fit the English version.

The government's reliance on English property crime statutes predating the founding also fails for other reasons. First, the Supreme Court has cautioned against uncritical reliance on English precedents that do not reflect distinctly American practices. *See Heller*, 554 U.S. at

593-94. Second, and most importantly, the government has not identified any American tradition of treating property damage—even when creating foreseeable danger—as grounds for permanent disarmament.

The absence of founding-era laws disarming property offenders is telling. If the founders understood property crimes, even serious ones, to justify stripping the fundamental right to bear arms, we would expect to find evidence of such laws. Without such evidence, the government has failed its burden under *Bruen* and *Diaz*.

### 3.   Going-armed laws provide no relevant analogue for property damage convictions

The district court, no doubt due to the lack of analogous Founding-era property crimes, relied on going-armed laws as a historical analogues. ROA.69. This fundamentally misunderstands both the nature of those laws and their relationship to property offenses. Going-armed laws prohibited carrying weapons in a manner that terrorized the public or disturbed the peace. These laws targeted a specific evil: individuals who actively menaced others with weapons, creating immediate fear and disrupting public order.

As this Court explained in *Diaz*, going-armed laws "punished 'those who had menaced others with firearms'" and "disrupted the public." 116

15

F.4th at 470-71. The critical element was the active threatening of others with weapons. These laws required proof that the defendant actually carried weapons in a threatening manner—conduct fundamentally different from damaging property without any weapon.

The "why" and "how" of going-armed laws diverge completely from Mr. Debrow's property damage conviction. Going-armed laws addressed the immediate threat posed by armed individuals terrorizing others—a public safety concern focused on preventing imminent violence. Property damage, even when creating foreseeable danger, addresses different concerns: protecting property interests and deterring reckless conduct. The methods also differ dramatically. Going-armed laws required proof of actually carrying weapons threateningly, unlike Mr. Debrow's weaponless property offense.

Mr. Debrow's conviction for damaging police vehicles during a traffic stop shares no meaningful similarity with the armed terrorism that going-armed laws addressed. He did not terrorize the public by going about armed. He damaged property in a discrete incident that ended with his immediate surrender. To accept going-armed laws as analogues for property damage would impermissibly expand *Bruen's* historical

16

methodology, transforming every crime involving potential danger into grounds for permanent disarmament.

The district court's broad interpretation cannot withstand scrutiny. *Bruen* requires precise analogical reasoning, not vague comparisons based on potential dangerousness. The government must show that founding-era Americans specifically disarmed those who damaged property, not that they disarmed some categories of potentially dangerous individuals. No such showing has been made here.

### 4.    This Court's precedents in *Reyes*, *Betancourt*, and *Simpson* are distinguishable

The government will likely invoke this Court's recent decisions upholding § 922(g)(1) against as-applied challenges in cases involving vehicle-related offenses. These cases, however, involved materially different conduct that justified different constitutional outcomes under *Bruen's* historical analysis.

In *United States v. Reyes*, 141 F.4th 682 (5th Cir. 2025), the defendant's predicate conviction involved evading arrest or detention using a vehicle. The Court emphasized that Reyes had an extensive violent criminal history. During the underlying offense, an "officer attempted to conduct a traffic stop, but the vehicle failed to yield, ran a

17

stop sign, and continued to travel at a high rate of speed with its headlights off." *Id.* at 686, n.8. Moreover, Reyes had multiple other felony convictions, including "deadly conduct discharge of a firearm" when he was sixteen years old. *Id.* at 686. In that incident, officers responded to "a report of shots fired at a residence" where they found "a vehicle, which was parked outside [the] residence, had five bullet holes in it." *Id.* at 687 n.9. This violent history of firearms misuse and endangering the public formed the basis of the Court's conclusion that § 922(g)(1) was constitutional as applied to Reyes.

Similarly, in *United States v. Betancourt*, 139 F.4th 481 (5th Cir. 2024), the defendant's conduct was far more dangerous than Mr. Debrow's. Betancourt "disregarded a flashing red light while driving at his vehicle's maximum speed" of "107 miles per hour, causing a major crash and serious injuries to two people." *Id.* at 484. The Court characterized this as violent conduct based on the extreme speeds, the extended pursuit nature of the offense, and the actual serious injuries inflicted on innocent people. This extreme recklessness with actual, not merely potential, harm to others justified the Court's conclusion.

18

Most recently, in *United States v. Simpson*, 152 F.4th 611 (5th Cir. 2025), this Court upheld § 922(g)(1) as applied to a defendant convicted of evading arrest with a vehicle. However, Simpson is distinguishable from the instant case in several critical respects.

*First*, Simpson's underlying conduct involved an active attempt to flee from police during a traffic stop where he "accelerated" his vehicle, "lost control[,] and collided into a brick wall." *Id.* at 614. This demonstrated an active decision to engage in dangerous driving behavior that created an immediate public safety risk. The Court specifically treated this as "violent conduct" that supported the § 922(g)(1) conviction. *Id.* at 686-87.

*Second*, and significantly, Simpson had aggravating factors entirely absent in Mr. Debrow's case. When Simpson attempted to evade police, he was "already a convicted felon, and he had cocaine and a loaded revolver in his possession." *Id.* at 614. The presence of both drugs and a loaded firearm during the commission of the predicate offense demonstrated a connection to precisely the type of dangerous criminal activity that § 922(g)(1) was designed to prevent. Simpson was actively misusing his right to possess firearms at the time of his predicate offense.

19

*Third*, the *Simpson* Court's analysis explicitly connected the Texas statute under which Simpson was convicted to the historical "going-armed" laws, noting that the statute sought to "discourag[e] forceful conflicts between the police and suspects." *Id.* at 615. This connection to preventing armed confrontations aligns with the historical tradition of disarming those who posed immediate violent threats.

Mr. Debrow's case presents fundamentally different facts. His conviction involved property damage during a discrete, stationary incident—not a high-speed chase endangering the public across miles of roadway. Unlike Simpson, who accelerated and lost control, Mr. Debrow struck two police vehicles at low speed while attempting to flee a traffic stop, then immediately surrendered. ROA.64, 236. He did not lead police on an extended pursuit at dangerous speeds through populated areas. He did not cause injuries to anyone. And critically, unlike Simpson, Mr. Debrow did not possess drugs during the commission of his predicate offense.

The distinction matters under *Bruen's* historical methodology. Extended high-speed chases that endanger the public for prolonged

periods share characteristics with historical crimes that resulted in disarmament. A momentary property damage incident during a traffic stop does not. To hold otherwise would eliminate any meaningful limitation on § 922(g)(1), converting every felony involving theoretical danger into grounds for permanent disarmament regardless of whether historical precedent supports such a result.

Simpson's underlying conviction involved a clear nexus to the type of violent, dangerous conduct historically justifying disarmament. The defendant was actively engaging in drug crimes while armed during a dangerous flight from police. Mr. Debrow's single conviction for property damage—even with the statutory element of foreseeable risk—lacks this nexus to the historical tradition of disarming dangerous individuals who have demonstrated a willingness to misuse firearms or engage in actual violence against others.

### 5. Preservation of the constitutional claim for further review

Should this Court determine that its precedents in *Reyes*, *Betancourt*, and *Simpson* foreclose Mr. Debrow's as-applied challenge, Mr. Debrow respectfully preserves this constitutional argument for further review. The Supreme Court's evolving Second Amendment

21

jurisprudence, particularly following *Rahimi*, continues to refine the proper application of historical analogues to modern regulations. Mr. Debrow maintains that permanently disarming individuals based solely on property offenses lacks any grounding in the Nation's historical tradition of firearm regulation, and that such applications of § 922(g)(1) cannot survive the rigorous historical analysis that *Bruen* demands.

## CONCLUSION

For the foregoing reasons, Appellant Talanzo Debrow respectfully requests that the Court reverse the district court's denial of his motion to dismiss and remand with instructions to dismiss the indictment.

Respectfully submitted,

REBECCA L. HUDSMITH
Federal Public Defender

BY:  *s/ Dustin C. Talbot*
DUSTIN C. TALBOT
Appellate Chief
Federal Public Defender's Office
Middle and Western Districts of Louisiana
102 Versailles Boulevard, Suite 816
Lafayette, Louisiana 70501
Telephone: (337) 262-6336

*Attorney for the Appellant*

22

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has this day been served by the 5th Circuit electronic filing system on the Assistant United States Attorney, on October 23, 2025.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,889 words.

2.  This document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century typeface with a 14 point font.

Lafayette, Louisiana, October 23, 2025.

*s/Dustin C. Talbot*
DUSTIN C. TALBOT